216

HUMBLE OIL AND REFINING COMPANY ET AL V. D. J. HARRISON.

No. A-1225. Decided October 22, 1947.
Rehearing overruled November 26, 1947.
(205 S. W., 2d Series, 355.)

*Andrews, Kurth, Campbell & Bradley,* of Houston, for Union National Bank of Houston, guardian of Pierce Withers Estate; *W. C. Hock,* of Fort Worth, for Danciger Oil & Refining Co., *R. E. Seagler, Robt. F. Higgins, Rex G. Baker,* all of Houston, for Humble Oil and Refining Co. and T. J. Hudgins; *Black & Stayton* and *Charles L. Black,* all of Austin, for Humble Oil & Refining Co., Danciger Oil & Refining Co., and T. J. Hudgins, all petitioners.

*H. G. Dunlap, Fouts, Amerman & Moore,* and *Joseph W. Moore,* all of Houston, for resepondent.

MR. JUSTICE HART delivered the opinion of the Court.

Humble Oil & Refining Company, joined by others claiming interests as its partial assignees, brought this suit to remove a cloud from and to quiet the title to its mineral leasehold interest in 1074.4 acres of land in Brazoria County, Texas. The defendants in the suit were D. J. Harrison and Mrs. Lottie Otto and her husband, M. C. Otto, who are owners of undivided interests in the minerals. Humble alleged in its petition that Harrison cast a cloud on its title by contending that the leasehold estate had terminated as to Harrison's interest by reason of the asserted failure of Humble to pay to him the correct amount of delay rentals. Mrs. Otto and her husband were joined as defendants but no relief was sought against them. Harrison answered, alleging that Humble had failed to pay delay rentals to him as required by leases then in effect and that by reason of such failure the leases had terminated as to Harrison's interest. The Ottos answered by a general denial. In a trial before the court without a jury judgment was entered denying

plaintiffs all relief, adjudging that the defendant D. J. Harrison is the owner of an undivided one-half interest in the minerals in the 1074.4-acre tract free and clear of any claims asserted by the plaintiffs, and dismissing the suit as to the Ottos. Upon appeal by Humble and its assignees, the Court of Civil Appeals affirmed the judgment of the district court. 199 S. W. 786.

The questions presented by this appeal are (1) whether the delay rentals tendered by Humble to Harrison were sufficient in amount and, if not, (2) whether under the facts of this case Harrison is estopped to assert that the leases have been terminated.

The facts are undisputed and may be summarized as follows:

The 1074.4-acre tract was the separate property of Mrs. Maud S. Paddock, who, on March 19, 1928, by a deed in which she was joined by her husband, conveyed it to Henry Banker, reserving an undivided one-fourth interest in the minerals, but giving to the grantee the power to execute mineral leases binding on the entire mineral estate. On April 28, 1928, Henry Banker conveyed the land to Mrs. Lottie Otto. It is undisputed that at all times thereafter until Mrs. Otto and her husband executed a mineral deed to Harrison, Mrs. Otto owned an undivided three-fourths interest and Mrs. Paddock owned an undivided one-fourth interest in the minerals, subject to the oil and gas leases executed by them respectively.

Without expressly purporting to exercise the power given in the deed from Mrs. Paddock to Banker, Mrs. Otto and her husband, on November 8, 1932, executed a mineral lease to Pierce Withers covering 874.4 acres of the 1074.4-acre tract. On December 24, 1932, Mrs. Otto and her husband and Mrs. Paddock and her husband joined in a lease of the 874.4-acre tract to Withers, "in lieu of and to take the place of and in confirmation and ratification of" the lease of November 8, 1932, which had been executed by the Ottos alone. The lease of December 24, 1932, contained the usual "unless" clause, providing for the payment of semi-annual delay rentals of $2.50 per acre "for all of the land," and that payments thereunder should be made three-fourths to the Ottos and one-fourth to the Paddocks. This lease on October 24, 1935, was assigned by Withers to Humble. The Ottos have extended the lease as to the 874.4 acres by agreements dated June 7, 1937, and December 21, 1942. These extension agreements did not amend the provisions of the lease with regard to the amount or the division of delay rentals.

The Paddocks did not join in the extension agreements affecting the 874.4 acres. On April 20, 1938, Humble released to the Paddocks its rights as lessee in the 874.4 acres in so far as the rights of the Paddocks were concerned. On June 27, 1938, the Paddocks executed to Humble a lease covering their one-fourth interest in the minerals in the entire 1074.4 acres, which in the "unless" clause provided for annual delay rentals of $5.00 per acre, the payment to be calculated on the basis of one-fourth of 1074.4 acres, or 268.6 acres. This lease was extended by a new lease executed by the Paddocks on June 3, 1943, which contained the same provisions as to the payment of delay rentals.

On February 20, 1939, the Ottos alone executed to Humble a lease covering their interest in the 200 acres of the 1074.4 acres which had been excepted from the leases and extension agreements previously executed by the Ottos. This lease in the "unless" clause provided for annual delay rentals of $5.00 per acre, the payment to be calculated on the basis of three-fourths of 200 acres, or 150 acres. This lease was extended by the Ottos by an agreement dated December 21, 1942, which did not change the agreement regarding the payment of delay rentals.

On February 8, 1944, the Ottos executed to Harrison a mineral deed conveying an undivided interest in the minerals in the entire 1074.4-acre tract. This deed contained the following provisions:

"KNOWN ALL MEN BY THESE PRESENTS: That we, Lottie Otto and husband, M. C. Otto, of Fort Bend County, Texas, hereinafter called Grantor, for and in consideration of the sum of Ten and No/100 ($10.00) Dollars cash in hand paid by D. J. Harrison, hereinafter called Grantee, the receipt of which is hereby acknowledged, have granted, sold, conveyed, assigned and delivered, and by these presents do hereby grant, sell, convey, assign and deliver unto the said Grantee, an undivided one-half (1/2) interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in Brazoria County, Texas, to-wit:" (Here follows a description of the 1074.4 acres)

"In the above described tract of land the Grantors own three-fourths (3/4) of the minerals and are hereby conveying two-thirds (2/3) of their said three-fourths (3/4) of the minerals, or an undivided one-half (1/2) of said minerals. Said land being now under oil and gas leases from Grantors and of record in the Deed Records of Brazoria County, Texas, and owned

by Humble Oil & Refining Company, it is understood and agreed that this sale is made subject to the terms of said leases and/or any other leases from Grantors now valid and now of record in the Deed Records of Brazoria County, Texas, covering same, but covers and includes one-half (1/2) of all the oil royalty, gas royalty and royalties on other minerals due and to be paid under the terms of said lease or leases in so far as they cover the above described land.

"It is understood and agreed that one-half (1/2) of the money rentals, which may be paid, on the above described land, to extend the term within which a well may be begun under the terms of said leases is to be paid to the said Grantee; and, in event that the above described leases for any reason become cancelled or forfeited, then and in that event, Grantee shall own one-half (1/2) of all oil, gas and other minerals in and under said lands, together with a like one-half (1/2) interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the above described land."

On the same date that the mineral deed was executed Harrison mailed to Humble a photostatic copy of the mineral deed, together with a letter, which read in part as follows:

"It is our understanding that you are the owners of oil and gas leases from Mrs. Lottie Otto and husband covering portions of 1074.4 acre tract in the Shipman & Charles League in Brazoria County, Texas. We hand you herewith photostatic copy of mineral deed from Mr. and Mrs. Otto conveying to D. J. Harrison 1/2 of the minerals, rentals and royalties, and we ask you to change your records accordingly."

On February 15, 1944, Harrsion mailed to Humble a certified copy of the mineral deed from the Ottos. On February 18, 1944, Humble's agent in charge of its records mailed to Harrison a letter in which receipt was acknowledged of the certified copy of the mineral deed and it was stated that "our records have been amended in accordance with this instrument."

The supervisor of the land rental division of Humble's oil department, who is a licensed attorney at law, testified that he had charge of setting up the rental to be paid to Harrison under the mineral deed from the Ottos, and that he construed the deed to mean that thereafter Humble should pay to Harrison one-half of the rentals which had theretofore been payable to the Ottos. Humble's rental records, which were introduced in evidence, show that they were changed in accordance with this construction.

The next rental payment which fell due after the execution and delivery of the mineral deed to Harrison was the annual payment due on March 1, 1944, on the 200-acre tract. Under the lease executed by the Ottos, a total payment of $750.00 was payable to the Ottos, and following its construction of the mineral deed Humble, on February 23, 1944, deposited in the bank at Needville, which had been designated in the lease as the depository, the total sum of $750.00, with instructions to credit $375.00 to the Ottos and $375.00 to Harrison. On the next day the bank mailed a deposit slip to Harrison showing the amount of the deposit, which, it was stipulated, was received by Harrison "in due course of mail." It was also stipulated that Harrison's address was in Houston and that Needville is 45 miles from Houston, and it is evident that the deposit slip was received by Harrison before March 1, 1944. However, Harrison at that time made no objection to the amount of the deposit to his credit in the bank and made no request for any additional payment.

The next rental payment which fell due was the semiannual payment due on May 8, 1944, on the 874.4-acre tract. Under the lease executed by the Ottos on this tract, a payment of $1,639.50 was due to them, and following its construction of the mineral deed from the Ottos to Harrison, Humble, on April 28, 1944, deposited in the Needville bank the total sum of $1,639.50, with instructions to distribute to Harrison the sum of $819.75 and the same amount to the Ottos. The bank, on April 29, 1944, sent a deposit slip to Harrison, which was received by Harrison, according to the stipulation of the parties, "in due course of mail" at Houston. It is evident that this deposit slip, like the one for the rental on the 200-acre tract, was received by Harrison before the due date for the payment of the delay rental, but no objection was made at that time by Harrison to the amount of the payment and no demand was made for an additional payment.

On June 10, 1944, Harrison for the first time made known to Humble that he contended that the delay rentals placed in the bank to his credit by Humble were insufficient. On that date he wrote a letter to the Needville bank, sending a copy to Humble, in which he acknowledged receipt of the deposit slips dated February 23, 1944, and April 28, 1944, and concluded as follows:

"These rentals have not been paid in accordance with the terms of the respective leases, and for that reason these leases have lapsed and are null and void as to my interest. This let-

ter will serve to notify you that I refuse to accept the rentals referred to."

The next rental-paying date for the 874.4-acre tract was November 8, 1944, and prior to that date Humble deposited with the Needville bank to Harrison's credit the sum of $1,093.00. On November 7, 1944, Humble wrote to Harrison, stating that it had made the deposit to Harrison's credit, with the explanation that it was willing to make what it contended was an overpayment in order to satisfy Harrison's contention and to keep the lease in effect. Harrison promptly replied on November 8, 1944, by a letter in which he referred to his letter of June 10, 1944, and made the demand that Humble execute releases to him, "since these leases are null and void as to my interest."

On February 28, 1945, Humble made a similar tender to Harrison of what is considered an overpayment of the rental on the 200-acre tract, by depositing $500.00, in the Needville bank to Harrison's credit, and notified Harrison of this deposit. Harrison replied on Marh 8, 1945, stating that "these leases are null and void as to my interest," and demanding that Humble forward to him executed releases covering his mineral interest. Humble, on each rental-paying date thereafter, has tendered, and Harrison has refused to accept, payments of $1,093.00 on the 874.4-acre tract and $500.00 on the 200-acre tract. Humble has also paid the Ottos and the Paddocks, respectively, all rentals due and payable to them.

■ (1) Construing the mineral deed as a whole, we conclude that the proper construction to be placed on the deed is that Harrison is granted an undivided one-half interest in all of the minerals and an undivided one-half interest in all royalties, bonuses and rentals. We do not think that the interest in the minerals or the interest in the royalties, bonuses and rentals, was intended to be limited to one-half of Mrs. Otto's interest. As the parties expressly state in the mineral deed, it is recognized that Mrs. Otto owns an undivided three-fourths interest in the minerals, and in order that the meaning of "one-half" as used in the deed may be defined, it is stated that it shall mean two-thirds of Mrs. Otto's three-fourths interest, or one-half of the whole.

While this conclusion is not disputed as to the possibility of reverter in the minerals, it is urged that the parties intended to make a different division of the rentals because of their reference in the deed to the oil and gas leases from the Ottos then in effect and the provision in the deed that "one-half (1/2) of

the money rentals which may be paid, on. the above described land, to extend the term within which a well may be begun under the terms of said leases is to be paid to said Grantee." It is urged that since Ottos, separately from the Paddocks, made extensions of the lease on the 874.4 acres and a lease on the 200 acres, the rentals provided for in such leases executed by the Ottos were only the rentals payable to the Ottos. More specifically, it is argued that since under the lease of the 874.4 acres, the Ottos were entitled to receive only three-fourths of the total semiannual rental of $2,186.00 (874.4 acres at $2.50 per acre) or $1,639.50, Harrison was entitled to receive only one-half of this amount, or $819.75, which was the amount tendered by the Humble; and that since under the lease of the 200 acres the Ottos' annual rental payment was reduced to three-fourths of 200 acres, or 150 acres, at $5.00 per acre, or $750.00, Harrison was entitled to receive only one-half of this amount, or $375.00, which was also tendered by Humble.

We think that this construction unduly emphasizes one phrase in the deed and conflicts with the parties' real intentions. It is evident that the Ottos intended to convey and Harrison intended to acquire an undivided one-half interest in all of the minerals in the entire 1074.4 acres, subject to existing leases. In the absence of a provision of the deed to the contrary, the ownership of an undivided one-half interest in the minerals would carry with it one-half of the delay rentals as an incident to such ownership. Harris v. Currie, 142 Texas 93, 176 S. W. (2d) 302. If the parties intended to convey a different interest in the rents and royalties, their intention to do so should be expressed in the deed. They did not express such intention by merely referring to the leases previously executed by the Ottos. Under the leases which were in effect at the time the mineral deed to Harrison was executed, the Ottos were entitled to receive three-fourths of the total delay rentals payable by the Humble. While the Paddocks executed separate leases covering their one-fourth interest, the delay rentals payable to them were calculated on the same basis ($5.00 per acre annually, or $2.50 per acre semiannually) for the whole tract, as in the Otto leases, the amount to be received by the Paddock being reduced in proportion to the size of their undivided interest. The reference in the mineral deed to Harrison to the leases executed by the Ottos was for the purpose of identifying the leases under which the delay rentals were payable to the Ottos. The Ottos, under these leases, were entitled to receive three-fourths of the total delay rentals, and they sold to Harrison one-half of the total delay rentals, to be payable out of the three-fourths which otherwise would have been payable to the Ottos.

It is significant that the deed provides that "one-half (1/2) of the money rentals, which may be paid, *on the above described land,* to extend the term within which a well may be begun under the terms of said leases, is to be paid to Grantee." (Emphasis ours.) The land previously described in the deed is the entire 1074.4 acres. One-half of the delay rentals payable *on the land* means one-half of the entire rentals and not one-half of a fractional interest therein. King v. First National Bank of Wichita Falls, 144 Texas 583, 192 S. W. (2d) 260, (163 A. L. R. 1128). The parties did not say in the deed that the grant was limited to one-half of the rentals *payable to the Ottos.* If the grant had been so limited, the grant would have to be restricted in accordance with the unambiguous language of the instrument. Richardson v. Hart, 143 Texas 392, 185 S. W. (2d) 563. However, where the language of the grant is ambiguous, it is to be construed against grantors rather than against grantee. Hoffman v. Magnolia Petroleum Co. (Com. App.) 273 S. W. 828. While an ambiguity is created by the reference in the mineral deed to the leases executed by the Ottos and the rentals payable thereunder, we conclude that, considering the deed as a whole, the intention of the parties was that Harrison was granted the right to receive one-half of the entire rentals and not merely one-half of the rentals payable to the Ottos. Klein v. Humble Oil & Refining Co., 126 Texas 450, 86 S. W. (2d) 1077; Clemmens v. Kennedy, 68 S. W. (2d) 321 (writ of error refused); Allen v. Creighton, 131 S. W. (2d) 47, (writ of error refused); Spell v. Hanes, 139 S. W. (2d) 229, (writ of error dismissed, judgment correct). It follows that Harrison was entitled to receive one-half of the semiannual rental of $2,186.00 payable on the 874.4 acres, or $1,093.00, and one-half of the annual rental of $1,000.00 payable on the 200 acres, or $500.00, and that in tendering $819.75 and $375.00 Humble did not tender to Harrison the amounts which he was entitled to receive under the mineral deed to him from the Ottos.

(2) The question remains whether Humble's lease is terminated as to Harrison's interest because Humble mistakenly advised the depository bank to credit Harrison's account with a less amount than he was entitled to receive and to credit to the Ottos' account a greater amount than they were entitled to receive, at the time of each payment. It is undisputed that Humble deposited in each instance a total amount which paid the delay rentals in full; its only mistake was in misconstruing the mineral deed and erroneously dividing the delay rentals between the Ottos and Harrison. There is no evidence that Humble did not act in good faith, nor does the evidence show

that Humble acted negligently. The evidence shows affirmatively that Humble has been willing to make overpayments in order to keep the lease alive. While we have concluded that the construction of the mineral deed adopted by Humble's agent, a licensed attorney, was erroneous, there were provisions in the deed which make its meaning ambiguous and the construction adopted by Humble's agent was not without reasonable foundation. The letter sent by Harrison to Humble with the copy of the deed was not, when considered with the deed, unambiguous, because it likewise was subject to the interpretation that one-half of the royalties *payable to the Ottos* had been assigned to Harrison. Although Harrison was notified, by receiving the deposit slips, that Humble construed the mineral deed to entitle him to receive only one-half of the Otto's share of the rentals, he made no protest and no demand for an additional payment, but remained silent until after the rental-paying dates had passed.

■ It is well settled in this state that the lessee under "unless" leases, such as those involved in this case, has a determinable fee, and that if he fails to drill or to pay delay rentals his lease is terminated. W. T. Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S. W. (2d) 27; 2 Summers, "Law of Oil and Gas," Sec. 337. In applying this rule, some cases have required a strict compliance by the lessee with the terms of the lease relating to the payment of delay rentals, holding that a small deficiency in the amount of the payment or a failure to make the payment until a short time after its due date terminates the lease. Young v. Jones, 222 S. W. 691; Coker v. Benjamin, 83 S. W. (2d) 373; Appling v. Morrison, 227 S. W. 708; Empire Gas & Fuel Co. v. Sanders, 22 Fed. (2d) 733. The application of the rule has been relaxed in some cases, however. In Perkins v. Magnolia Petroleum Co., 148 S. W. (2d) 266 (writ dismissed, judgment correct), it was held that a lessee sufficiently complied with the requirement of the payment of delay rentals by making a joint deposit in the depository bank of the total amount due under separate leases to different lessors, where the lessors were disputing as to the extent of their respective interests. In Miller v. Hodges, (Com. App.) 260 S. W. 168, it was held that the lease continued in effect and that the lessee was excused from making payments of delay rentals after the lessor brought suit to cancel the lease, during the pendency of the suit. In Mitchell v. Simms (Com. App.) 63 S. W. (2d) 371, it was held that where the lessors received a payment of the delay rental after its due date, the lessor became estopped to assert that the lease had terminated because of delay in the payment.

In the present case, Humble's failure to pay to Harrison his full share of the rentals originally payable to the Ottos is due primarily to a misconstruction of an ambiguous mineral deed to which Humble was not a party, and, secondarily, to a failure on the part of Harrison, after he knew that Humble had misconstrued the deed, to notify Humble of the proper construction. Each of the leases executed by the Ottos contained the provision that "no change in the ownership of the land or part thereof, the minerals or interests therein, shall impose any additional burden on Grantee." It would be an imposition of an additional burden on the lessee to require that the lessee determine at its peril the proper construction of an ambiguous instrument thereafter executed by the lessors, conveying a part of their interest in the minerals and the royalties, bonuses and delay rentals. Where, as in this case, the lessee has in good faith made a mistaken construction of the lessors' partial conveyance of their interests and lessee has made a payment in accordance with such construction, of which the assignee has notice, the duty rests on the assignee to notify the lessee of its mistake so that the lessee will have an opportunity to make a proper payment of the delay rentals. Where the assignee, instead of giving the lessee such notice, remains silent, we hold that the assignee is estopped to assert that the lease has terminated as to his interest on the ground that the lessee has failed to pay to him a sufficiently large share of the delay rentals.

While we do not know of any case presenting the exact situation involved here, we think the general principles of equitable estoppel are applicable. In Burnett v. Atterberry, 105 Texas 119, 145 S. W. 582, 587, this Court said:

"An estoppel may arise as effectually from silence, where it is a duty to speak, as from words spoken. One may be induced to act to his injury on account of the silence of one interested in a transaction, and when such course of action is permitted with the knowledge of the interested party or induced by silence or tacit acquiescence, the doctrine of estoppel may be invoked."

See also Johnson v. Sovereign Camp, W. O. W., 125 Texas 329, 83 S. W. (2d) 605.

We hold that Harrison is estopped to assert that Humble's lease has been terminated because of its failure to make sufficient payments of delay rentals to him. Accordingly, the judgments of the district court and the Court of Civil Appeals are reversed and judgment is rendered in favor of petitioners.

Opinion delivered October 22, 1947.

Rehearing overruled November 26, 1947.

MR. JUSTICE SMEDLEY concurring.

I concur in the opinion of the majority, except in its holding that respondent Harrison, by the mineral deed from the Ottos, acquired the right to a rental payment of $500.00 instead of $375.00 to prevent the termination of the lease of the 200-acre tract. That mineral deed, in my opinion, is correctly construed as clearly evidencing the intention of the grantors to assign to respondent one-half of the money retals provided to be paid by the terms of the lease of that tract that had been executed by the Ottos and was then in effect. The lease of the 200 acres to which the mineral deed referred was the lease executed by the Ottos February 20, 1939. By its terms the annual rental was $750.00. One-half of that amount, $375.00, was assigned to respondent Harrison and was duly paid to him.

Opinion delivered October 22, 1947.